# SUPPLEMENT.

THE HONORABLE JAMES BERNARD CARROLL, an Associate Justice of this court, died while still a member of this court on January 8, 1932. On November 19, 1932, a special sitting of the full court was held at Boston, where there were the following proceedings.

The Attorney General addressed the court as follows:

May it please your Honors: A committee of the Bar of the Commonwealth have drawn a Memorial of the late justice of this court, James Bernard Carroll. The members of this committee are Addison L. Green, Wallace R. Heady, James E. McConnell, Edward F. McClennen and Frank W. Grinnell. They have requested me to present the Memorial on behalf of the Commonwealth.

## JAMES BERNARD CARROLL: A MEMORIAL.

JAMES BERNARD CARROLL was born in Lowell, Massachusetts, January 10, 1856. His father was Patrick Carroll of Leitrim, Province of Connaught, Ireland, who came to this country in 1840 and settled in Lowell, where he became a merchant. His mother was Bridget (O'Rourke) Carroll, also born in the Province of Connaught, from whence she came to this country and to Lowell, where she met Patrick Carroll, and they were married. Two sons were born of this union, the older dying while still an infant. Patrick, the father, died when James was but eight years of age, and thereafter his mother and he moved to Worcester, where he prepared for college in the public schools. The path to college was not an easy one. Money was lacking and the boy, determined upon education and a college training, was obliged to work his way and augment as far as possible the slender family income. In 1874 he entered

Holy Cross College and paid his way there largely, if not wholly, by acting as principal of an evening high school in Worcester.

In thus forcing him to earn his education, the Fates may, at that time, have seemed harsh to the young man, but in reality they were kind. The struggle that he endured, the personal contacts that he made, the knowledge of men and of their mental workings that he secured, the self-reliance that resulted served in no way to weaken the natural sweetness of his disposition, while it undoubtedly strengthened his mental, moral and spiritual fibre.

He was graduated from Holy Cross College in 1878 with the degree of Bachelor of Arts and in the same year entered Boston University Law School. Upon his graduation from the Law School in 1880, *cum laude*, with the degree of Bachelor of Laws, he entered the law office of Matthew J. F. McCafferty in Worcester. But his stay there was brief, for in the autumn of the same year he came to Springfield to consider the possibilities for a young lawyer, and, being favorably impressed, moved there January 1, 1881, and thereafter made it his permanent residence.

On June 15, 1884, he married Mary E. Corbett of Lowell, who survives him. No children were born of this union. By nature a home loving, domestic man, many of the happiest hours of his life were spent with his wife at his own fireside, among his books.

In 1895 he formed a partnership with William H. McClintock, and later John F. Stapleton, Jr., of Holyoke, was added to the firm, then known as Carroll, McClintock & Stapleton. Both of the partners predeceased him. Some time after the death of John F. Stapleton, Jr., John F. Jennings was taken into the firm, which was then known as Carroll, McClintock and Jennings.

From the first his success as a lawyer was assured, and before he went on the Bench, he was acknowledged a leader of the Bar not alone in his own city but throughout the State. The reasons for his success are clear to those who knew him. He was fundamentally honest in thought and action. He possessed an irresistible charm of manner, a

ready wit, a graceful and pleasing person, a command of clear and correct English and a power of expression that at times rose to the heights of eloquence. Those qualities not only helped to win and keep clients, but were of inestimable advantage before a jury, where he was so often to be found.

Back of all these qualities were others, without which no permanent success would have been possible. James B. Carroll was a sound lawyer, thoughtful and studious. He appreciated, as perhaps few lawyers do, the importance of preparation before trial, and the law and facts involved in his every issue were carefully examined and briefed. His mind was quick to grasp the essential facts and law upon which a case would turn. He was fair with witnesses, courteous to his opponents, candid with the court. Juries were apt to believe what he said and judges gave careful attention to his law.

While by no means universally true, since he had many wealthy clients, nevertheless it is a fact that a large part of Attorney Carroll's practice came from the poor. This was but natural, for his sympathies were always with them. Inasmuch as litigation for the poor arises mainly from injury to person, he was retained in many suits for personal injuries and a substantial amount of the tort law of this Commonwealth was settled in his cases.

Mr. Justice Carroll never held many political offices. He was city solicitor of Springfield for two years, and showed marked ability as the city's attorney in bringing about an understanding with the Boston and Albany Railroad Company that resulted in the abolition of the old grade crossing on Main Street and the construction of a modern railroad station. Belonging to a minority political party, he accepted, through party loyalty rather than choice, nominations for various political offices — Lieutenant Governor, District Attorney and Mayor of his city. As early as 1880 his capacity in the political forum was recognized and in that and subsequent elections, whether campaigning in his own behalf or in behalf of others, he proved himself a resourceful, witty and brilliant speaker. His own vote

was invariably well ahead of his party's strength and showed clearly the confidence in which his fellow citizens held him. But his rapidly growing legal practice, as well as natural inclination, urged him to limit his energies to his profession. He might at almost any time during a long period, had he consented, been his party's candidate for Governor or its choice for United States Senator, but he would not. He declined the office of Assistant United States District Attorney, although it had the allurement of association with the late George M. Stearns of Chicopee, the Nestor of the Hampden County Bar at that time, who was then the United States District Attorney and whom he particularly admired.

Mr. Justice Carroll was a profoundly religious man with intense religious convictions, which he exemplified by daily practice of his own faith. No matter how busy he was or how hard pressed with work, he would find time to attend daily religious exercises of his church. His religious inclination was shown in the books of his choice. By nature a scholarly man, always a student, he was fond of reading, especially biography, psychology and science, but he was particularly attracted to the last as related to Christianity and its evidences. In 1925 he was made a Knight of St. Gregory.

In 1912 he received the degree of Doctor of Laws from his alma mater.

In 1911 the Legislature of Massachusetts passed the act commonly known as the workmen's compensation act, which took effect July 1, 1912. It was in the development of this tribunal that perhaps the most important of Mr. Justice Carroll's life work centered. He was named chairman of the newly created State Industrial Accident Board May 15, 1912, and remained its chairman until late in the year 1914, when he left to become a Justice of the Superior Court. Similar legislation had existed in England since 1880 and there was some English precedent, but only nine of our States had enacted workmen's compensation laws prior to those of the Commonwealth of Massachusetts, and all of these were enacted within so brief a time that there

was but little American precedent to aid in guiding this new body. During his chairmanship, he established the policy and outlined the method of work to be pursued by the commission. The task was to strip the proceedings of this semi-judicial body of all technicalities, to give its full benefit to employees throughout the Commonwealth by making its remedies prompt, simple, inexpensive and effective. In this work he was aided by the confidence that the working people of the Commonwealth had in him. How well he succeeded in preserving that confidence is shown by the fact that they opposed his appointment to the Superior Bench because they did not wish to lose him from the chairmanship of the Industrial Accident Board. One of Mr. Justice Carroll's cherished possessions was a set of hand illumined resolutions from the Central Labor Union of Springfield expressing the appreciation of organized labor for his services upon the Board.

Having been appointed an Associate Justice of our Superior Court, he took the oath of office on December 21, 1914, but his service there was brief, for on January 20, 1915, he was appointed one of the Justices of our Supreme Judicial Court.

At this time Mr. Justice Carroll was fifty-nine years of age and at the full maturity of his intellectual vigor. He brought to the service of the court not only a well grounded knowledge of the law but a ripe personal experience of its application in business and in litigation. He had a wide and intimate acquaintance with his legal brethren and was familiar with the practical problems involved in the trial of cases. As an advocate he had believed that his province was to help the court by arguments commensurate with his ability to intelligent decision. As a judge he imputed the same high interest to others. So he was self-fitted to be an attentive and considerate listener to the arguments of the advocates before him. No worth while argument presented to his court found him reluctant to give it place. He radiated his interest to the bar and it was felt there. Thus he raised the quality of the arguments before the court by persuading the bar that the sincere efforts of advocacy would

win from the court their merited reception. He knew as few did the human impulses and had a profound sympathy for the needy and unfortunate. He possessed the confidence of the people of this Commonwealth to a very unusual degree and that confidence was extended to the court of which he was a member. His service upon the bench was of a high order, and he bore his full share of the court's work, writing almost one thousand opinions during his nearly seventeen years of service. His keen knowledge of human nature, his scholarly mind, his grasp of the law, the vigor and clarity of his expression, made his decisions lucid and convincing. He was still engaged in the work of our highest court when death called him January 8, 1932.

May it please your Honors: In memory of the Honorable James Bernard Carroll, the Bar of the Commonwealth moves that this Memorial be made a part of the records of this Court.

David I. Walsh, Esquire, then addressed the court as follows:

May it please your Honors: I shall leave to my brethren at the Bar who were more closely associated in the courts with James Bernard Carroll the task of paying tribute to him as a jurist and of reviewing the scope and character of his judicial service. I prefer to speak of the departed as a friend and co-worker in the public service and to express publicly my appreciation of the influences that guided his life and the qualities which contributed to his conspicuous career.

James Bernard Carroll possessed real solid talents and achievements that should not be obscured even by his splendid record as a jurist. In the spotlight of his long professional life and of his earlier political activities, he was ever in the public gaze, even more than as an honored associate member of this court. In those years he was a personality at once outstanding, remarkable and striking.

As an advocate in his early life nature gave him many advantages over other lawyers. He had an earnestness and

sincerity to which his voice gave unmistakable expression. There was a mannerism and attractiveness about him, which were increased by the touch of a sweet Gaelic accent and twinkle, not always discerned; but once discerned, captivating and persuasive.

No one in want of legal aid or personal advice ever knocked at his door, looking for assistance, in vain. He thought less of fees or lawyer's rewards than he did of the triumph of his cause. He but loved the opportunity, fraught with serious responsibility, to help the poor litigant. In the early years when he was struggling for a place at the bar in Springfield, and even up to the time when he turned from the law to direct the administration of the untried workingmen's compensation laws, the lowly, the unfortunate and the penniless of Springfield found in him a friend, counsellor and pleader, whose sympathy for them and their cause he could interpret with eloquence to the jurors before whom he stood, session after session, during those years when he was preparing himself to answer the certain call of the Commonwealth for men of his talents. Often he tided one who needed legal assistance over that period when all hopes seemed gone. His devotion to his professional duty won back ambition for the disheartened, and his victory brought back faith in the justice of mankind. He embraced the opportunity to send a poor litigant a victor to new accomplishments.

Whether discussing law or facts before a court or jury, he was clear, logical and convincing. All who opposed him felt his latent power, but appreciated his courtesy and perfect fairness. When associated with him as a fellow advocate, or when associated with him on the platform in a public cause, there was a sense of relief that his part would be splendidly sustained.

"Integrity" is the word I would choose to typify the dominating influence of his being. He never made an effort in a cause that he himself did not believe in. He was a painstaking lawyer, but his integrity, as it should, outshone his ability. He was always a student, but a student of those life problems and that legal lore that developed in him

acquirements that constituted more than a mere fund of legal knowledge.

He was a man of exceptional determination and courage — courage that was interior, not blatant. In addition, he was so gentle, so naturally kind and considerate, that all who knew him respected him.

His life always was most religious. He found unbounded consolation in the teachings of his church. His eloquent expositions of the doctrines of this church on many occasions were public expressions of the truly exemplary man. He was very anxious, however, not to proclaim himself a religious advocate. He chose rather to be known as and truly to be a simple, unobserved communicant. His trust in and reverence for his Creator were as simple and unquestioned as that of the peasants of Brittany. His charities, like his religious practices, went often, as he insisted they should, unnoticed and unmentioned.

To be easy of approach; to be a loyal friend; to acknowledge the human tie and be swift to take the charitable view; to be slow to judge; to hold personal honor with another higher than any written bond; to speak the plain truth if one speaks at all — all these personal qualities were characteristic of Judge Carroll, as also of many other men who have attained honorable stations in life.

Yet there is something more. It eludes all description. The lack of it will mean defeat — or make one merely of the crowd. For him who possesses it we make a special niche. Death alone seems to reveal it in its intensity. Death disclosed it in him.

To James Bernard Carroll death was just one of the events of his life which he accepted with the acquiescence and readiness that had characterized his every call to duty.

"I have lived for this day," he said calmly, as he realized that his span of mortal life was rapidly drawing to a close. Although he had lived many years in the turmoil and strife of life, of political triumphs and defeats, of judicial routine and exactness, and had passed through the vicissitudes of many a trying hour, of nerve-racking conflicts, of political misunderstandings, Judge Carroll had throughout been at

peace, for he never lost the vision at the end of life's trail. He never lost sight of the supernatural. This was one of the most controlling influences in his life. As he moved about, associating with his fellows and meeting his daily tasks, he carried in the recesses of his soul a secret that was hidden from all of us — the supernatural influence that guided, strengthened and inspired him to do the just thing and pursue the honorable course. Truly here was a man who walked with his Maker in every activity of life. Because this influence directed his course, his fellow men instinctively believed in him and acclaimed him a "just man" — one just to himself, to his fellows, and to his Creator.

As he had no fear in passing through the gateway of mortality, so in his worldly career Judge Carroll had no fear. If he believed he was right, he did not stop to consider possible consequences to himself, but resolutely girded himself to let naught but duty and conscience sustain him. The tribunal beyond the human was where he looked for vindication.

He was a great man — not merely in the sense of prowess of intellect or loftiness of position — he was great not because of his ability nor because of his position in public life was many degrees beyond the ordinary — but because he was a spiritual man, a humble man, a modest man; because power or dignity never chilled his sympathies with the poor, the helpless, and the unfortunates; and this alone constitutes an enduring monument to his memory.

Thousands of his fellow citizens in Springfield will never know the soundness and the clarity of his decisions; his long slavish hours of labor in the cause of justice. But they will nevertheless picture him to the coming generation as a justice of the highest court of Massachusetts, leaving his home in Springfield Sunday evenings to sit in and become a co-worker with the little band of Vincentians — spiritually minded workingmen who give of their time and thought to aid the poor and destitute in their neighborhood. Here we find the upright and resolute Judge, planning for the distribution of a bag of flour to one family, a basket of coal to

another, shoes for a barefoot boy, medicine for the needy
sick, a physician for the mother in her travail, a few dollars
to help meet the payment of a widow's rent bill, and the
location of a home for an orphan.

Surely here is real greatness — greatness that illuminates
position and power because it is interwoven with humility
and benevolence to the less fortunate of one's fellow beings.
"Inasmuch as ye have done it unto the least of these my
brethren, ye have done it unto me."*

He was proud, — Oh, so proud — of his membership in
this court! He appreciated the honorableness, the dignity,
the splendid untarnished record of achievement of the
Massachusetts Supreme Judicial Court. He was as solici-
tous for its reputation as a cloistered nun for her modesty.
I never met him when he did not dash instantly into expres-
sions of enthusiasm and delight over his labors and prob-
lems as a member of this court. It was not the honor, but
the opportunity to serve his fellow man in a responsible and
exalted position that dominated him. He seemed to me as
one who was really happy and most exuberant when he was
executing the commissions of this court, that to most of us
seem irksome. He impressed me as one who had all the
fire of devotion, all the directness, all the terseness, all the
qualities of simplicity of form and straightness of thought
which have made for the greatest jurists of a Common-
wealth, conspicuous from the beginning of the Republic for
the ability and eminence of its jurists.

The lessons afforded by the life of this great lawyer and
jurist, whose loss the people of Massachusetts deplore, con-
stitute an incentive calling upon all lawyers to dedicate their
lives to a higher and more complete fulfillment of duty.

It was given to him not only to serve his fellow men faith-
fully, but to offer an elevating and noble example of duty
well and faithfully performed. Contemplating his life, its
simplicity, his devotion to duty, its exalted conception of
public service, the faith that comes to us for service to
country and to God, the highest reward of man will be ours.

---

* Matthew xxv, 40.

May I, in this, my humble effort, add this word to help lay the foundation in the permanent records of this court of a monument to his memory which shall continue to speak of his great moral and mental qualities and his courageous and conscientious discharge of professional, political, and judicial duties, long after we ourselves shall have gone.

Wallace R. Heady, Esquire, then addressed the court as follows:

May it please your Honors: I hold in reverence the memory of James Bernard Carroll as lawyer, advocate and judge; as a man great in mental, moral and spiritual stature.

When I came to Springfield forty-two years ago, James B. Carroll was a bright, rising star in the legal sky. The course of the star was laid across the zenith of that sky. I watched its long, slow, bright progress to its setting, as stars set, in the distant west.

To pursue the figure, there were three great luminaries that shone upon us humbler members of the bar, exciting our admiration and futile emulation — George M. Stearns, William H. Brooks and James B. Carroll.

James B. Carroll was far from being the least of that great trio; and beyond that it is not judicious that this comparison should go. There are two or three, now with us in our county, who were close rivals of those eminent men.

I deal now only with the subject of this memorial occasion.

Perfect integrity, highly conceived, was only one of the many manifestations of a character that was broadly and deeply based on all the principles and virtues of an ideal Christian gentleman.

He was richly endowed with all those mental faculties that are comprehended in the word intellectuality in the highest sense of that term.

He was a many-sided man; in adherence and devotion to the Christian church of which he was a member and in which he was a shining and hardly equalled exemplar among

its laymen; in civic interest and activity; in love of the writings of the great intellectuals of his own and earlier generations; and first, last and always, through all and over all, in love of his professional and of his judicial work and the science of the law on which these last were founded.

If genius is extraordinary talent, put through the crucible of hard labor, his genius lacked no element to the consummation we observed.

Like all who have risen to highest position and service in the law, the science of the law was a ruling, a pervading passion of his mind. Studying it as one who sought something greater and deeper than merely lucrative gain, he became deeply versed in that great fundament of the civilization of the English-speaking world — the common law — drawn from the deep wells of human experience through long ages.

He was a devoted student and, in very many cases in this great tribunal in which he finally served, he was a blazer of the way of the law's application to the kaleidoscopically changing conditions of the generation in which he did his professional and judicial work.

He had what is aptly known as the legal mind; that faculty of mind which perceives with clarity the law evolved through the ages, or declared in constitution or statute, as related to the proper welfare of all individuals and of the State itself; the legal mind that made John Marshall the greatest lawyer of his time, with scarcely any training or book learning in the law, and that, with like handicap, raised Abraham Lincoln to the higher levels of the profession.

James B. Carroll with similar legal mind had the benefit of high education, general and special, and of profound study.

There was a more spectacular side to his career — the forensic display of the qualities of a great advocate. Depth of nature; breadth of understanding; intuitive insight into all the fundamental impulses and emotions that are common to all men and can be played upon by the master mind; oratorical talent even more natural than acquired; grace

and strength of diction alternately delighting or moving the auditor as the subject or phase of argument require; a touch of the histrionic, which every orator must have — all these are the panoply of the great advocate, and all these James B. Carroll possessed and displayed on very numerous occasions in the courts of this Commonwealth, especially those of his home county.

Forensic oratory is more closely in contact with its audience than any other. The eloquence of such eyes as James B. Carroll possessed heightened the eloquence of the words; and so I picture him as the great and moving advocate.

He was of an intensely sympathetic nature. Throughout all of his long career at the bar as lawyer and advocate he was almost invariably plaintiff's lawyer. How often have I seen him stand before a jury in final argument, and, with a slow shaking of the head, a gesture befitting the words, say to them that the heart is a surer guide than the head. That may have been, and probably was, when he was arguing as to the amount of damages. It is vivid in my mind among the many pictures of him that with me, as with many others, "hang on memory's wall."

He was no gloomy or clouded figure in life. He possessed in full measure the saving and sustaining sense of humor. Those of us who knew him through nearly all of his career at the bar can recall numerous occasions when he sat with other lawyers in the lawyers' room near the court room and was a ready and entertaining participant in the quips and jests and the keen flow of wit, and even in the badinage between lawyers about former clients and cases; each speaking about the clients and cases of the other man.

Any account of his great work and accomplishment which should leave out his sense of wit and humor would be incomplete and inaccurate.

He stepped from the highest rank of the bar to judicial service. The humanitarian aspects of the Industrial Accident Board tempted him, and from there the upward and onward steps to the bench of the Superior Court and then to many years' service on the bench of this great court of law appeals, the Supreme Judicial Court, were natural and

almost inevitable. He brought to his judicial service as great distinction as he brought to his service at the bar.

He was a man humble of soul and spirit. He did not look upon his judicial rank as exaltation; but as opportunity. He walked humbly with his fellow men.

He was of an intensely religious nature and he gave constant and strong expression to this feeling, in the method and manner invited by his church.

He was throughout all his life a devout member of a great church, and throughout all his life he worshipped devoutly and humbly in its pews and before its altars.

No doubt of the immortal and eternal destiny of man entered or clouded his mind. Let the scientists thunder on the left and on the right and before, he held and proclaimed his unwavering belief that man was indeed a special and particular creation from the hand and power of God, and not in any way otherwise derived.

His was an unfaltering trust. It was not within his concept that man could die as the beasts die — that the spirit of man could die —

> . . . this intellectual being,
> Those thoughts that wander through eternity,  .
> To perish . . . swallow'd up and lost
> In the wide womb of uncreated night.*

Mortality will have its way. The spirit grows ever brighter, but the flesh grows weak.

Of those who pass on in old age, it has been said:

> Strange that a harp of thousand strings
> Should keep in tune so long! †

In that novel which is history, entitled "Death Comes for the Archbishop," ‡ the aged Archbishop, crowned with the honors of a life of great service, being ill with a cold in his home a few miles outside of Santa Fé, said to his young

---

* MILTON: *Paradise Lost,* Book iii, line 146.
† WATTS: *Book ii, Hymn 19.*
‡ Willa Cathers.

companion, "I would wish to die in Santa Fé." His companion said, "One does not die of a cold." The old man smiled and said, "I shall not die of a cold, my son. I shall die of having lived."

And so our Brother passed from us to that fuller, greater, more ideal life, which his vision had held ever before him.

James E. McConnell, Esquire, then addressed the court as follows:

May it please your Honors: While in high school it was my privilege to hear Judge Carroll deliver an address when he had been at the bar but a few years, and the impression he made by his sincerity and eloquence remained in my memory.

The son of immigrants to this country; bereft of his father; without the aid of wealth, family or social position, but with an inheritance of vigor, and deep religious conviction which ever guided his footsteps, he struggled for an education. He must have early charted his course and steered straight and true as the needle to the pole until he reached the harbor he sought, of his chosen profession.

In the beginning, it was but natural that the young lawyer should find his clients among the poor and unfortunate in personal injury cases, and success in those cases against the ever present defense of want of due care and assumption of risk was a field of activity that required intensive study and analysis of precedents and ability of persuasion before juries. No small measure of his success was due to his ability before juries; to his fairness; his clarity of expression; and the knowledge gained of the operations of the human mind from his contacts with fellow men. He felt that new and complex questions arising from the changes in our commercial and industrial life demanded departure from rigid precedents.

Success could not be denied to one who had, to a great degree, the fundamentals acquired by tireless energy; scholarly attainments enriched by love of literature and ability of expression, which at times amounted to eloquence.

He became a leader in the courts of his county, and in the competition of a bar among whose members like Stearns, Robinson, and Brooks, leadership was not easily won.

In personal injury cases, recognizing the great reputation for ability he had acquired, it was often my custom, as I doubt not it was also the custom of others, to seek his briefs before this court for study and models.

But a time arrived when a call for duty to his fellow men came: it was a humanitarian reform for the aid of the injured employee; he was in receipt of a large income from a successful practice; found his fullest enjoyment in the environment of his home and the associations of his home city; it was sympathy with the plight of the injured employee and the poor whom he had always known from contact in practice in his early days at the bar that impelled him to sacrifice a large income and the home life with his evenings among his loved books to accept the appointment of chairman of the Industrial Accident Board. It was pioneering work, and to the task he brought a knowledge of the plight of the injured employee, energy, understanding and a sympathy with the spirit of the work that insured its successful administration.

Here I may record a fact not generally known. He had such a high concept of the duty of a lawyer, that, when the awards given to petitioners by the board were appealed to this court, to be briefed and argued by able lawyers representing the insurer, he was so sympathetic with the injured, that, realizing that the petitioners were unable to employ attorneys, he persuaded members of the bar to appear before this court voluntarily in behalf of the awards to petitioners; and several of the early cases decided by this court were briefed and argued by attorneys without compensation due to his persuasive appeal to the bar.

His work in the Superior Court was of short duration and he came to this court with matured powers and experience in *nisi prius* work unsurpassed by any member of the bar. A studious reader in fields outside the law and possessing a wonderful memory, he acquired a style that was clear and

logical; writing opinions was with him a matter of ease rather than of hardship.

No truly adequate conception, however, of the real influence which he exercised among his fellow men can be found without knowledge of the man himself. He loved companionship; was a charming host, giving to the favored guest at his fireside the full measure of his hospitality. To those who knew him, his whole life was an open book; he was of unimpeachable integrity; gentle in manner and courteous to all, with a keen sense of humor; with a heart beating in unison with the impulses of humanity and a sympathy with the unfortunate that never dulled.

But the dominant characteristic of the man was that in a materialistic age he was a devoted student of, and a profound believer in God's word; firm and consistent in the faith which he professed, but with respect for the faith of those who differed.

Often in the midst of onerous duties, he began the day by attendance at religious service, without ostentation, but as an humble worshipper at the altar of his God.

His life and work was an answer to the prayer of the poet of his home city,* who said:

> God give us men. The time demands
> 　Strong minds, great hearts, true faith, and willing hands;
> Men whom the lust of office does not kill;
> 　Men whom the spoils of office cannot buy;
> Men who possess opinions and a will;
> 　Men who have honor; men who will not lie;
> Men who can stand before a demagogue
> 　And dam his treacherous flatteries without winking;
> Tall men, sun-crowned, who live above the fog
> 　In public duty and in private thinking.

Addison L. Green, Esquire, then addressed the court as follows:

May it please your Honors: James Bernard Carroll brought to the Supreme Judicial Court in addition to the diligence, learning and love of justice for which he was dis-

---

* Josiah Gilbert Holland: *Wanted.*

tinguished, two elements that deserve especial recognition. One was the confidence which the people of this Commonwealth had in him and the other was the capacity he possessed of inspiring counsel before him to their best endeavor. His associates at the Western Bar are proud of his work as an Associate Justice of this court, and they recognize the importance and the extent of the work he there performed, the learning, sound judgment and broad human sympathy that are reflected in the many opinions that he wrote.

But Mr. Justice Carroll lives in the memory of his associates especially as a brilliant trial lawyer. He began that career in Worcester, the day after he was admitted to the bar, by trying a case against the Fitchburg Railroad, which he won.

Soon afterwards he settled permanently in Springfield, where his success was rapid and sure. It was an exceedingly brilliant bar against which he had pitted his talents. Its leaders then were the versatile and brilliant George M. Stearns, the courtly and convincing Ex-Governor George D. Robinson.

I first met him in the lawyers' lobby of the court house in Springfield — it was in 1887. He had even then won recognition in Hampden County for his character and ability. I recall, as if it were yesterday, the slender, graceful figure, the natural courtesy and the cordiality with which he welcomed one who had not then been admitted to practice. This same courtesy and cordiality, especially to the younger members of his profession, are among his best remembered characteristics and many a young lawyer, now grown old in the profession, remembers gratefully the encouragement and advice that he received from James B. Carroll in those difficult days when he was trying to find his place at the bar.

He was an unusually successful trial lawyer and before he accepted in 1912 the chairmanship of the Industrial Accident Board he had established his position not only in his own bar, but also at that of the Commonwealth of Massachusetts. His mind was analytical and logical, he was naturally studious and diligent, he understood almost

instinctively the workings of the human mind. He thought quickly and accurately and he had an unusual faculty for clear and concise statement. In the court room he was consistently courteous to his opponents, fair with witnesses and respectful to the court. Endowed with ready wit, a wit that flashed even beside that of George M. Stearns, he used it only to lighten the stress of contest, to illustrate an argument, not to sting, — it never left a scar behind.

His mind went quickly and directly to a decisive point of the case he was trying and he never lost sight of it. He refused to be led into by-paths, however attractive they might be. He learned early that the purpose of an argument was to convince, and that, in order to convince, it was best to avoid arts and graces otherwise attractive that divert the mind from the issue in question. And so as the years went by few lawyers had acquired so completely as he the art of plain man to man argument that made him so successful with court and jury.

His cases were prepared with meticulous care and the law bearing upon the case at issue was carefully briefed. He was early convinced, and said so, that most cases were won or lost before they were tried. He was especially candid with the court and did not hesitate to cite all pertinent cases that had come to his attention bearing upon the issue, whether they sounded favorable to him or not. He believed that that was his duty to the court, as one of its officers, that his duty to his client consisted in analyzing the cases and distinguishing as far as feasible such cases as seemed unfavorable.

By nature James B. Carroll was sympathetic, and especially so with the poor and needy. Probably this natural bent had been increased by the struggle he had been compelled to endure as newsboy and night school teacher in order to win an education. This inherent sympathy with the unfortunate is the key to his character and to understand it is to understand the moving forces of his life. It is seen in the causes that he championed, the predominant class of cases that he tried, his willingness to act as chairman of the Industrial Accident Board, the sacrifice of a

large personal income for an unremunerative public position. More significant than his success as chairman of that board is the fact that he served from a sense of duty. It was a task in which the financial rewards were unattractive and the work hard. He unquestionably took it because he was persuaded that he could thus best serve the interests of the toilers in this Commonwealth and make successful a law in the principle of which he thoroughly believed. How well he succeeded is known and recognized in this Commonwealth.

When he left us last January, he left behind him the memory of a sound lawyer, a just judge, a home-loving, affectionate husband, a good citizen, a kindly Christian gentleman.

Chief Justice Rugg responded as follows:

Mr. Attorney General and Brethren of the Bar: Custom and wisdom bid us gather here to pay tribute to the talents, character and judicial achievements of our departed comrade. James Bernard Carroll was a member of this court from January 27, 1915, until his death on January 8, 1932, almost seventeen years. He came to it in the full strength of mature manhood at the age of fifty-nine. He brought to it the ripe experience of one eminent as a general practitioner at the bar. He devoted himself to the discharge of judicial duties with a singleness of purpose which suffered no interruption or diversion. His preparation for his profession was thorough. He had the advantage of the classical and philosophic training of Holy Cross College. The foundation of learning in the law was acquired at the law school of Boston University. Notable leaders, such as George M. Stearns and George D. Robinson, influenced and inspired the early years of his practice in Springfield. He had garnered the rewards available in the beaten path of the lawyer. He was industrious in the acquisition of learning in the law. The allegiance of a wide circle of clients, the confidence of his brethren, the esteem of judges, an unblemished reputation for integrity and universal

respect among all kinds of people were his. He was persuasive with jurors, helpful in argument to the courts, prudent in counsel, apt in business affairs. He was keen and accurate in his intuitions concerning the motives which incite action. He knew men and affairs. He was interested in the concerns of the public, had been the candidate of his party for important offices in city and State and was an attractive and effective speaker in election contests. But he did not yield to the allurements of political life. He was steadfast in devotion to the law, proverbially a jealous mistress.

The enactment of the workmen's compensation act in 1911 was an adventure into the regulation of money payments for personal injuries received in industrial employment, then an almost untried field in this country. Its success or failure depended in no small measure upon the capacity of the members of the Industrial Accident Board by whom it was to be administered. As first chairman of that board, Judge Carroll at once won the confidence of workmen, business men, and the public. He brought to this delicate and highly important task sagacity, experience in practical affairs, intimate knowledge of human nature, a broad range of capabilities. He formulated the general principles for the operation of the plan outlined in the statute.

He administered its provisions with due regard both to the injured employee and to manufacturing, mercantile, building, and other business so vital to the prosperity of the Commonwealth. He manifested rare skill in a difficult position. He remained chairman long enough to establish the system upon a firm footing. He left a record of unusual accomplishment as a constructive power in a new domain of law. He was upon the Superior Court for so brief a period that in substance and effect he came to this court fresh from the bar. He was appointed in succession to Henry N. Sheldon, who had resigned. His visible work as a member of this tribunal is embodied in nine hundred and sixty-seven opinions expressive of the decision of the court contained in fifty-seven volumes of our reports; the

first was in *Haskell* v. *Cunningham*, 221 Mass. 49, and the last in *Faris* v. *Travelers Indemnity Co.* 278 Mass. 204. He wrote no dissenting opinion and joined with others in only one. It would be vain on this occasion to undertake to review these judgments in any detail, or to attempt to select the most outstanding. Doubtless varying in excellence, all are uniformly of fine quality. They are as brief as the nature of the cases permitted. They are not overweighted with citations. They contain no excursions into cognate or analogous regions of the law. They are direct, luminous, forcible. They are strictly confined to the points necessary for decision. They rarely are blemished by *dicta*. Their diction is smooth; their style is simple; their language is clear and easy of comprehension. They possess the lucidity born of unclouded thought. These opinions constitute his enduring memorial. By these he will be known in the years that are to come. Their power for good and their potency in upbuilding sound jurisprudence, their value as precedents and as guides, have passed beyond the influence of present praise. We can add nothing to the elevation of his character, to the distinction of his career, to the nobility of his service for the general welfare. We can but hope to delineate traits which fade with the memory of the living who have known him intimately.

Judge Carroll was extraordinarily rapid in the performance of judicial work. This was the result of remarkable quickness of perception of the dominant issues involved in a case, easy grasp of the controlling principles of law, and unusual facility in their correct statement as applied to particular facts. Although passing from us in mid-winter, at a season when most of his associates have much unfinished work in hand, he left nothing undone. All his assignments were performed. It was his habit to press steadily forward without haste and without delay to the completion of every task. He was a strong influence in discussion in consultation. He brought sound judgment, insight into the fundamental factors, comprehension of the practical bearing of proposed decisions, capacity for face to face debate and a mind open for the adoption of better reasons. He always

did his best. When any judicial work was finished and made a part of the records of the court, he accepted criticism with equanimity and without complaint. He was armed so strongly in his own honesty that nothing could shake his conviction of duty fully done. His dignified bearing, considerate manner, discriminating intellect and capacity for quick perception made him peculiarly effective in presiding over *nisi prius* sittings of the court. Familiar with the best in literature, he was alert to know the latest contributions from modern masters in essay and biography. He was ever inclined to help the young and inexperienced. His home life was a close approach to the ideal. By nature, self culture and mode of living he was far removed from all temptation, yet he was "not so absolute in goodness as to forget what human frailty is." His character was of singular strength and beauty. His courtesy was unruffled. Even under most trying tests, his courage was unflinching. He never faltered. He had a flaming hatred of deceit, wrong, injustice, whatever might be their disguise. He cherished the lofty ideals of the great departed judges whose labors in the past have been wrought into the fabric of our institutions and have shed luster upon the name of our beloved Commonwealth. He had a genius for friendship. He was modest in disposition and retiring in manner. He could not have been unconscious of his power in forensic speech. His clear blue eye, gracious voice, pertinent story, virile thought, rendered him always welcome where men gather to be enlightened. But very rarely could he be induced to speak on the platform or at after dinner functions. Companionship with him was a constant pleasure. He was full of humor and good cheer. He enjoyed association with his fellows. Gentleness of spirit was interwoven with his strength. His ready and kindly wit, genial and engaging conversation, rendered association with him a joy.

With persistent fidelity he sought after faith, hope, charity. Conscience and spirituality were regnant forces in his character. He ate with humility the bread of prosperity and the fruit of honor. No appraisal of Judge Carroll would be complete which omitted mention of his devout

adherence to the Roman Catholic Church. He was constant and unwavering in belief in its tenets, in observance of its rites, in attendance upon its public worship, in active participation in its charities, and in striving for unceasing growth in religious stature in himself and others. Allusion has already been made at the bar to the striking evidence of his abiding faith in his final moments. Receiving the last sacrament of the Church and being told that there was little chance of his recovery, he replied with a smile, "I have lived my life for this day." Thus he was sustained to the very threshold of the great unknown. Notwithstanding the depth and firmness and power of his own convictions, he was tolerant toward those of other allegiance. In one of his few public utterances after entering upon judicial life, an address to a large gathering of Catholic clergy and laymen, he said: "We must begin by recognizing that men and women who differ with us in religion are just as sincere in their beliefs as we are in ours. We must respect the honest opinions of all men. We Catholics, too, must remember that the principles of religious liberty which we enjoy in our dear land were given to us by men, the great majority of whom were Protestants and sincere Protestants at that; men who regularly attended public worship . . . the overwhelming majority of the legislators who enacted into our organic law religious toleration were Protestants . . . ."

The relations between the members of this bench are peculiarly intimate. The pang of separation caused by the unexpected death of Judge Carroll was poignant. It can hardly be appreciated without knowledge of the helpfulness, the generosity, the loyalty, the wisdom, which were the attributes of his work in the company of his associates on the bench. We all had warm personal affection as well as profound respect for him. We feel deep-seated regret that the Constitution and laws of the Commonwealth have been deprived of the strong, enlightened, and illuminating support and interpretation contributed by him for so many years. The sense of personal sorrow occasioned by the severance of those cherished ties which bound us so closely has been keen and it will abide. But our lives have been

enriched by his friendship. His labors have added distinction to the judicial annals of the Commonwealth.

The discriminating and eloquent addresses to his memory at the bar have been gratefully received. They attest the esteem in which he was held and recognition of the value of his judicial service.

The memorial and a record of these proceedings may be spread upon the records of the court.

The court will now adjourn.